UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNIQUE PRODUCT SOLUTIONS, LIMITED, | ) CASE NO. 5:10 CV 1912 - DAP |
| | ) JUDGE DAN AARON POLSTER |
| Plaintiff, | ) |
| v. | ) |
| HY-GRADE VALVE, | ) |
| Defendants. | ) |

**RELATOR'S BRIEF IN OPPOSITION TO DEFENDANT'S CONSTITUTIONAL CHALLENGE TO 35 U.S.C. §292**

**I.      INTRODUCTION**

35 U.S.C. § 292 ("Section 292")  authorizes "any person" to sue for the penalty prescribed therein, "in which event one-half shall go to the person suing and the other to the use of the United States."[1]  Under Section 292, Congress assigns to relators the authority to sue for wrongs done to the federal government or the general public.  Because the government is entitled to share in any recovery, *qui tam* litigation provides a financial benefit to the government and as well as a deterrent to future illegal conduct.

Defendant has moved to dismiss arguing that Section 292 is unconstitutional because it does not contain adequate mechanisms for government oversight and control of the litigation in violation of the Take Care and Appointments clauses of Article II of the U.S. Constitution.  In light of the substantial history of *qui tam* actions and the lack of a need for Executive Branch oversight of this action, the constitutional attack on Section 292 should be rejected by this Court, as it has been by the few other courts that have addressed the identical arguments.

---

[1] *Stauffer v. Brooks Bros.*, 619 F.3d 1321 (Fed. Cir. 2010)*; Forest Group, Inc. v. Bon Tool Co.*, 590 F.3d 1295 (Fed. Cir. 2009).

II. **ARGUMENT**

    A. **The History of *Qui Tam*s Confirms Section 292(b)'s Constitutionality.**

The essence of the *qui tam* device is that a private party can bring suit for a wrong done to the sovereign and is entitled to share in the recovery if the action succeeds. Central to any constitutional analysis of *qui tam* provisions is the Supreme Court's observation that "[s]tatutes providing for actions by a common informer, who himself has no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government." *Marvin v. Trout*, 199 U.S. 212, 225 (1905). The *qui tam* mechanism, first used in England in the 13th century, carried across the Atlantic and several colonial legislatures in America enacted *qui tam* laws before independence was declared. *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774-76 (2000).

*Qui tam actions* continued as a regular feature in early federal legislation after the adoption of the Constitution. The first Congress enacted several *qui tam* laws, at least five of which, like Section 292, provided for a division of recovery between the informer and the government, authorized the informer to file his own suit, and placed no restrictions on the class of persons who could serve as relators. *See Vermont Agency*, 529 U.S. at 777 n.6 (listing and describing these statutes). This history shows that *qui tam* actions were entrenched in American law by the time Section 292 was enacted in 1842, and the False Claims Act was enacted in 1863. *See* Act of March 2, 1863 (12 Stat. 696). Notably, the original version of the False Claims Act made no provision for intervention or control by the Executive Branch over a relator's suit. *See* Act of March 2, 1863, at ch. 67 § 6, (12 Stat. 698).

The Supreme Court recently affirmed the validity of the *qui tam* device in *Vermont Agency,* which involved the False Claims Act, which, like Section 292(b), allows relators to sue

2

for wrongs done to the federal government.  At issue was whether a relator suing under the False Claims Act, having suffered no injury, had Article III standing to sue. *Vermont Agency*, 529 U.S. at 768.  The Supreme Court concluded that the statute satisfied Article III because the United States suffered an actual injury by virtue of the False Claims Act violation, which the government in turn assigned to a private relator. *Id.* at 773-774.  The Court was "confirmed in this conclusion by the long tradition of *qui tam* actions in England and the American Colonies" (*id*. at 774) noting the history of the *qui tam* was "well nigh conclusive" on the issue whether *qui tam* actions were traditionally amenable to and resolved by the judicial process. *Id.* at 776.  The Supreme Court's substantial reliance on the longstanding history of *qui tam* provisions is consistent with the Court's many decisions looking to precisely this type of evidence in resolving constitutional claims.

As the Court has instructed, legislation "passed by the First Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning." *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888).  The Supreme Court "has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs acquiesced in for a long term of years, fixes the construction to be given its provisions." *Myers v. United States,* 272 U.S. 52, 175 (1926) (giving great weight in constitutional interpretation to the practices of the early Congresses); *accord Marsh v. Chambers,* 463 U.S. 783, 790 (1983); *Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986).  Moreover, *qui tam* provisions not only have a substantial historical basis but have been commonly used since their pre-colonial inception.  The many *qui tam* provisions passed by Congresses and signed by Presidents, as well as their application by the Supreme Court, have created an "established practice" concerning their

3

validity. The Supreme Court has on numerous occasions enforced *qui tam* provisions over many decades without raising doubts about their constitutionality. *See, e.g.*, *Marvin v. Trout*, 199 U.S. 212, 225 (1905); *United States v. Bornstein*, 423 U.S. 303, 309 (1976); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997). The Court has also stated that it views the utilization of *qui tam* mechanisms as a legislative option for Congress: "Whether proscribed conduct is to be visited by a criminal prosecution or by a *qui tam* action or by an injunction or by some or all of these remedies in combination, is a matter within the legislature's range of choice." *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441 (1957).

The Fifth Circuit, in *Riley v. St. Luke's Episcopal Hospital*, recently concluded that the same historical record on which the *Vermont Agency* Court relied in finding Article III standing for *qui tam* plaintiffs under the False Claims Act was "similarly conclusive with respect to the Article II question." 252 F.3d 749, 752 (5th Cir. 2001) (en banc). Following *Riley*, the district court in *Pequignot v. Solo Cup Co*., 640 F.Supp.2d 714 (E.D. Va. 2009), held that the long history of *qui tam* actions likewise supports the validity of the *qui tam* feature of § 292(b). *Id.* at 726. <u>Indeed, every district court that has considered an Article II challenge to Section 292(b) has upheld the statute.</u> *See, e.g*., *Pequignot*, 640 F.Supp.2d 714, *aff'd* 608 F.3d 1356 (Fed. Cir. 2010); *Shizzle Pop, LLC v. Wham-O, Inc*., 2010 U.S. Dist. LEXIS 86924, 2010 WL 3063066 (C.D. Cal. Aug. 2, 2010); *Harrington v. CIBA Vision Corp., * No. 08 C 251 (W.D.N.C. May 22, 2009); *Zojo Solutions, Inc. v. Stanley Works*, 2010 U.S. Dist. LEXIS 46407, 2010 WL 1912650, at *1 (N.D. Ill. May 12, 2010). Consequently, Defendant mere replication of the same type of constitutional challenge to *qui tam* actions previously brought against Section 292 must be denied.

### B. Section 292(b) Does Not Violate the U.S. Constitution.

The constitutional structure allocating authority between the three branches of government bestows power on the Congress to make the law, the Executive to enforce it, and the judiciary to interpret it. *Pequignot*, 640 F.Supp.2d at 724. This separation of powers can be undermined in two basic ways. First, one branch can aggrandize itself at the expense of the other. *Id.* (citing *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)). Second, one branch may prevent another branch "from accomplishing its constitutionally assigned functions." *Id.* (quoting *Nixon v. Adm'r Gen. Servs.*, 433 U.S. 425, 443 (1977)). In passing Section 292, Congress plainly was not aggrandizing itself at the expense of the Executive Branch; the statute grants no power to the legislative branch.

The remaining question, then, is whether allowing a Section 292(b) relator to bring a private suit somehow impairs the Executive Branch from accomplishing its constitutionally assigned functions. Defendant's attack on Section 292(b) starts from a false premise: that Article II of the Constitution requires Congress to empower the Executive, and *only* the Executive, to enforce the law. Although the Take Care clause "states that the Executive must 'take Care that the Laws be faithfully executed,' it does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law." *Riley*, 252 F.3d at 753 (citing U.S. Const. art. II, § 3) (emphasis in original). Moreover, the argument that the Appointments Clause makes *qui tam* litigation constitutionally impermissible holds even less vitality. *Id.* at 757.

### C. The Take Care Clause.

Defendant argues that either a private plaintiff cannot bring an action under Section 292 because it is not part of the Executive Branch or that the statute contains insignificant controls to ensure that the Executive Branch can take care that the law is faithfully executed by a private plaintiff. Both arguments are invalid. As to the first, to say that a function must be performed by

5

the Executive if the government is to perform it at all does not answer the question whether the Constitution requires that the function be performed exclusively by the government. If the Constitution were to vest the responsibility for bringing a particular suit (*e.g.,* to enforce Title VII or the antitrust laws) exclusively in an official of the United States government (as, for example, the Constitution vests the pardon power exclusively in the President), then constitutional questions might be raised if Congress tried to assign that authority to private persons outside the Executive Branch. But the Constitution imposes no such requirement here.

Rather, federal law frequently permits private parties to file civil actions alleging violations of federal law, even if governmental officials believe that no violation has occurred, and such common provisions obviously raise no separation of powers concerns. In many federal statutes, such as Title VII of the Civil Rights Act (42 U.S.C. §2000) and the Sherman Antitrust Act (15 U.S.C. §§ 9, 15), Congress has provided a private right of action by which aggrieved parties may both vindicate their rights under federal law and help achieve public objectives such as adherence to antidiscrimination or antitrust laws. The decision to afford a private right of action undoubtedly reflects Congress's desire to ensure that individual victims are compensated for their own losses. In addition, however, these provisions vindicate a societal interest in deterring and punishing violations of federal law by enlisting private individuals in the process by which Congress attempts to ensure that persons abide by federal law.

Moreover, Congress may authorize remedies such as punitive damages to be awarded to private parties, even though they serve no compensatory function but are instead designed entirely to advance the public interest in punishment and deterrence. *See, e.g., Smith v. Wade*, 461 U.S. 30, 51 (1983) (punitive damages may be awarded in suit under 42 U.S.C. § 1983 for "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law"); *Memphis Community School District v. Stachura*, 477 U.S. 299, 306 n.9 (1986) ("[t]he

6

purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior").[2]  In addition to these private rights of action, Congress has given the Executive Branch certain authority to enforce most or all of these statutes, and the mechanisms for enforcement include litigation that can in many respects parallel suits brought by private parties.  The fact that Congress has provided these alternative means of law enforcement does not raise separation of powers problems, even though the private causes of action may sometimes conflict with or even obstruct the preferred strategy of the Executive, including litigation strategy.  As these statutes demonstrate, the fact that a private person can pursue litigation to enforce federal statutes in no way violates the President's constitutionally assigned functions.  Thus, even assuming the Constitution requires Congress to provide the Executive with some means of enforcing laws against patent mismarking, the Constitution does not require Congress to establish litigation authority to be exercised by the Executive as the only means of carrying out the law.  *See Riley*, 252 F.3d at 753 ("Although the [Take Care] Clause states that the Executive must "take Care that the Laws be faithfully executed," it does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law").  Accordingly, Congress's decision to provide more than one mechanism of enforcement does not impinge on any function that the Constitution requires the Executive Branch to perform.

In other words, to say that a function must be performed by the Executive Branch if the government is to perform it at all does not answer the question whether the Constitution requires that the function be performed exclusively by the government or whether it can also be assigned to private parties.  In analogous contexts, the Supreme Court has rejected arguments that Congress cannot authorize private persons to exercise power that would, if committed

---

[2] For examples of federal statutes expressly authorizing the award of punitive damages, *see, e.g.*, 15 U.S.C. § 1691e(b); 25 U.S.C. § 305e(b); 45 U.S.C. § 711(j).

exclusively to the government, be carried out by the Executive Branch.  In *Currin v. Wallace*, 306 U.S. 1 (1939), for example, the Supreme Court upheld a regulatory scheme governing agricultural marketing in which Congress authorized the Secretary of Agriculture to regulate agricultural producers in some areas but provided that the scheme would go into effect only if a certain number of private growers voted for it to do so.  *Accord United States v. Rock Royal Co-op, Inc.*, 307 U.S. 533, 577 (1939).  Earlier, the Supreme Court upheld statutes that gave private parties authority that would otherwise, if assigned to the government, have been performed by the Executive.  For instance, the Supreme Court approved a law that assigned to a private industry group the power to impose safety codes that were binding on the industry and the public.  *See St. Louis, Iron Mountain & S. Rwy. Co. v. Taylor*, 210 U.S. 281, 285-87 (1908); *see also Butte City Water Co. v. Baker*, 196 U.S. 119, 127 (1905) (allowing groups of private miners to set binding rules governing mining claims).

Significantly, the Supreme Court in *Vermont Agency* declined to rely on a theory that a *qui tam* relator has standing simply because he is the "statutorily designated agent of the United States." 529 U.S. at 772.  The Court instead found that standing existed because of "the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor.  The [False Claims Act] can reasonably be regarded as effecting a partial assignment of the Government's damages claim."  *Id*. at 773.  Under this logic, a *qui tam* relator does not sue *as* the United States or even its statutorily designated agent.  Rather, a relator sues under a partial assignment made to him by Congress under the Constitution's property clause.  For this reason, the relator's suit does not unconstitutionally interfere with the discretion of Executive Branch to decide whether to litigate as the United States.

Defendant next argues that Section 292(b) undermines the Executive Branch by assigning to private relators the ability to enforce the false-marking statute without providing sufficient

8

executive control over the litigation. Defendant cites to the demanding standard for executive control that the Supreme Court applied in *Morrison v. Olson*, 487 U.S. 654 (1988). Morrison involved an Article II challenge to the Ethics in Government Act, the federal law creating an independent counsel to investigate alleged wrongdoing by Executive Branch officials. In upholding the law, the Supreme Court observed that it provided "sufficient control . . . to ensure that the President is able to perform his constitutionally assigned duties." *Id.* at 696. However, the current case is very different from *Morrison*.

The law at issue in *Morrison* assigned the independent counsel to act as the United States itself, whereas, as just discussed, a Section 292(b) relator does not act as the United States. *See Riley*, 252 F.3d at 755. Further, the independent counsel was endowed with prosecutorial like powers; a *qui tam* relator, in contrast, pursues only civil litigation. *See id.* Unlike criminal prosecutions, civil actions do not go to the core of the Executive's enforcement responsibility. *Id*. Moreover, the independent-counsel law expressly forbade the Department of Justice, an Executive organ, from going further in an investigation once the independent counsel became involved. Section 292(b), in contrast, imposes no such bar on the Executive; the government can always file its own action to enforce the false-patent marking statute. *Pequignot*, 640 F.Supp.2d at 727.

> [I]t is not necessary for *§ 292(b)* to meet the demanding standard applied by the Supreme Court in *Morrison* to withstand an Article II challenge, given that the intrusion of *§ 292(b)* into Executive Branch power is minor in comparison. A *qui tam* relator under *§ 292(b)* pursues a civil action, not a criminal one. Because civil actions do not "cut to the heart of the Executive's constitutional duty to take care that the laws are faithfully executed," the Executive Branch need not wield the same level of control over civil litigation as over criminal prosecutions. This principle is particularly compelling in the area of patent law, where private parties routinely litigate matters concerning the validity, enforceability, and infringement of patents. *Quite simply, enforcement of the substantive provisions of § 292 is not the type of Executive function whose delegation to an authority not controlled by the Executive Branch would presumptively raise serious Article II questions*. Moreover, the actual power wielded by a relator under *§ 292(b)* pales in

> comparison to that granted to the independent prosecutor in *Morrison*. The independent counsel was given "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice." *Morrison, 487 U.S. at 662*. In stark contrast, a *qui tam* relator under *§ 292(b)* can maintain only one type of suit - an action for false patent marking - and must do so at his own expense. Finally, *§ 292(b)* does not bar the government from initiating its own action, criminal or civil, to enforce the substantive false marking provisions of *§ 292(a)*. By comparison, in *Morrison*, once a matter was referred to an independent counsel, the Attorney General and Justice Department were required to suspend all investigations and proceedings regarding that matter. *For all of the above reasons, the Court concludes, as applied to the enforcement of proper use of patent markings, that the constitutional mandate that the Executive Branch "take care that the laws be faithfully executed" can be satisfied with a significantly lesser degree of control than the Supreme Court required in Morrison.*

*Solo Cup Co*, 640 F.Supp.2d at 726-28 (citations omitted) (emphasis added).

In short, Section 292(b) does not prevent the Executive from accomplishing its constitutionally assigned functions. And there is nothing in the Constitution that forbids the use of the *qui tam* device or requires the Executive Branch to "sign off" on a *qui tam* suit.

Defendant then speculates that one day the *qui tam* provision of Section 292(b) might impermissibly trench on Executive functions if the Executive wants to intervene in a case ruled by the personal agenda of a relator or where policy decisions of the United States are undermined. The court in *Pequignot* recognized that while Section 292(b) does not provide the same level of executive control over *qui tam* suits that the False Claims Act does, "the Executive Branch is not without the ability to assert its interests in a Section 292(b) *qui tam* action." 640 F.Supp.2d at 727. For example, the government must be notified of all patent suits, 35 U.S.C. § 290, and it can move to intervene in a *qui tam* case either as of right or with court permission under Rule 24. *Id.* And, if the United States does intervene, the relator cannot dismiss the suit without the government's consent. *Id.* at 727-28 (citing Fed. R. Civ. P. 41 (a)( 1 )(A)(ii)). "Finally, the United States may apply for a protective order if the relator's action interferes with a government investigation or prosecution." *Id*. at 728.

Even assuming that the inability of the United States to intervene in or terminate a *qui tam* suit would raise constitutional concerns, the government has not expressed a desire to intervene on the merits in *this* suit (despite being informed of the existence hereof by the undersigned). That a constitutional issue might theoretically be raised under hypothetical facts not before the court is no reason to strike down the statute in light of the settled canon that constitutional questions should be avoided unless absolutely necessary to settle a case or controversy. *See Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 465-66 (1989); *see also Pequignot*, 640 F.Supp.2d at 728 (declining to decide whether a different fact pattern not before the court would pose constitutional problems). The only question presented here is whether, consistent with Article II, a private party may bring a *qui tam* action without Executive Branch authorization or involvement. Because nothing in Article II forecloses such a result, Section 292 is not unconstitutional on its face, nor is there any basis to find it unconstitutional as applied to these facts.

### D. The Appointments Clause

Defendant also argues that the *qui tam* provisions in Section 292 violate the Appointments Clause in Article II of the Constitution (Art. II, Sec. 2, Cl. 2). Defendant asserts that *qui tam* relators function as "Officers of the United States," whose litigation of this suit pursuant to the statute violates that clause. Congress has not, in the words of the Appointments Clause, "established by Law" a government "Office" of informer or relator under Section 292. To the contrary, the statute simply states in relevant part that "[a]ny person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States." 35 U.S.C. § 292(b).

Neither the relator nor his attorney is entitled to the benefits, or subject to the requirements, associated with offices of the United States. These individuals do not, for example,

11

draw a government salary, nor are they required to establish their fitness for public employment. These considerations demonstrate that *qui tam* relators are not "Officers" within the meaning of the Appointments Clause; as used in that clause, the concept of "Officer" has always been understood to "embrace the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell,* 73 U.S. (6 Wall.) 385, 393 (1868). Thus, not every individual who exercises authority within a legal framework created by Congress is an "Officer" within the meaning of the Appointments Clause.

Instead, Supreme Court precedent establishes that the constitutional definition of an "Officer" encompasses, at a minimum, a continuing and formalized relationship of employment with the United States Government. *See Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890) (merchant appraiser is not an "Officer" for purposes of the Appointments Clause where his position is without tenure, duration, continuing emolument, or continuous duties); *United States v. Germaine*, 99 U.S. 508, 511-12 (1878) (surgeon appointed by Commissioner of Pensions was not an "Officer of the United States" where his duties were not continuing and permanent); *see also Edmond v. United States,* 520 U.S. 651, 659 (1997) ("Advice and Consent" of Senate provision in Appointments Clause serves to curb Executive abuses and "promote a judicious choice of persons for filling the offices of the union" (quoting *The Federalist* No. 76, at 386-87)). There is simply no language in the Appointments Clause, elsewhere in the Constitution, or in any apparent Supreme Court decision to support the proposition that this clause further applies to persons who are not officers or agents of the Government.

Insofar as the Appointments Clause is concerned, *qui tam* relators are analogous to plaintiffs who invoke a private right of action under any other federal statute. As explained above, these parties play an important role in the enforcement of federal law and the effectuation of Congressional policies, but are not thereby transformed into Officers of the United States.

Moreover, state officials and private persons are often assigned responsibility for the implementation of federal law, including to collect money for the benefit of the United States. For example, Social Security disability programs, as well as AFDC and Medicaid, are state-administered pursuant to contracts or agreements that obligate the responsible state officials to adhere to federal law. Private employers are required to deduct federal taxes from their employees' paychecks and transfer the money to the Federal Government; gasoline retailers are given similar obligations with regard to the collection of federal gasoline taxes. These individuals play a significant role in the effectuation of federal statutory schemes, but their role is plainly not governed by the Appointments Clause. Nothing in the Supreme Court's seminal Appointments Clause ruling in *Buckley v. Valeo*, 424 U.S. 1 (1976) is to the contrary. There, the Supreme Court stated that the function of the Federal Elections Commission in conducting civil litigation "may be discharged only by persons who are 'Officers of the United States' within the language of the [Appointments Clause]" 424 U.S. at 140. But *Buckley* in no way modified the long-settled principle that "Officers" are those who actually fill federal offices. Indeed, *Buckley* cites both *Germaine* and *Auffmordt* with approval. 424 U.S. at 125-26 & n.162. Moreover, in defining "Officers," the *Buckley* Court said that the term applies to "appointees" or "appointed officials" who exercise significant authority under federal law. *See, e.g.*, 424 U.S. at 131 ("Officers" are "all appointed officials exercising responsibility under the public laws."). Thus, because the members of the Federal Elections Commission in *Buckley* served in federal offices and conducted Executive functions, they had to be appointed pursuant to the Appointments Clause. That is quite different from requiring private persons who sue for themselves and simultaneously provide a benefit for the United States to be Officers of the United States in office under the Appointments Clause.

13

Simply put, *qui tam* relators have none of the characteristics associated with "Officers of the United States." They hold no government office, they draw no government salary, and in their own conduct of litigation under Section 292, they are not supervised by the Executive Branch. Although *qui tam* relators can play a significant role in the enforcement of federal law, and their actions often result in a benefit to the United States, the same is true of private actors in a variety of contexts, but this does not make them subject to the Appointments Clause. Several courts of appeals have agreed, in the context of the False Claims Act, that *qui tam* relators are not covered by the Appointments Clause. *See e.g.*, *Riley*, 252 F.3d at 757-58; and *Accord United States ex rel. Kelly v. Boeing*, 9 F.3d 743, 758 (9th Cir. 1993). Specifically, the Sixth Circuit, in *United States ex rel. Taxpayers Against Fraud v. General Electric Co.,* 41 F.3d 1032, 1041 (6th Cir. 1994), **concluded that the Appointments Clause is not applicable because a qui tam relator is not vested with any governmental power**. Most importantly, there is no indication that the Framers of the Constitution intended that the use of *qui tam* relators to achieve the Government's objectives violated that clause.

### III.  CONCLUSION

Defendant's challenge to the constitutionality of Section 292 should be rejected. As the Fourth Circuit has stated regarding the False Claims Act, "Congress has let loose a posse of ad hoc deputies . . . [Defendants] may prefer the dignity of being chased only by the regular troops; if so, they must seek relief from Congress." *Pequignot v. Solo Cup Co*, 640 F.Supp.2d 714, 729 (2009), citing *U.S. ex rel. Milam v. Univ. of Tex. M.D. Anderson Caner Ctr., 961 F.2d 46, 49 (4th Cir. 1992)*.

Respectfully submitted,

BUCKINGHAM, DOOLITTLE & BURROUGHS, LLP

By:  */s/ David J. Hrina*
     Mark J. Skakun  #0023475
     David J. Hrina  #0072260
     3800 Embassy Parkway, Suite 300
     Akron, OH 44333
     Telephone: (330) 376-5300
     Facsimile: (330) 258-6559
     Email: mskakun@bdblaw.com
           dhrina@bdblaw.com

*Counsel for Relator, Unique Product Solutions, Ltd.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically on February 11, 2011. Notice of this filing will be sent electronically to all parties by operation of the Court's electronic filing system or by ordinary U.S. Mail, postage prepaid, upon all parties who made an appearance in this action.

     */s/ David J. Hrina*
     David J. Hrina

«AK3:1056336_v1»